**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**No. 99-20754**

---

**WESTCHESTER MEDIA; NAVASOTA HOLDING CO., L.L.C.**

**Plaintiffs/Counter-Defendants/Appellants,**

**v.**

**PRL USA HOLDINGS, INC.; POLO RALPH LAUREN CORPORATION d/b/a
Delaware Polo Ralph Lauren Corporation**

**Defendants/Counter-Claimants/Appellees.**

---

**Appeal from the United States District Court for the
Southern District of Texas, Houston Division**

---

June 27, 2000

Before JONES, DeMOSS, and DENNIS, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellants Westchester Media and Navasota Holding Co. ("Westchester") appeal the judgment finding that their use of the mark "POLO" to title a magazine infringed marks for products sold by Polo Ralph Lauren entities ("PRL"). Two features distinguish this case from run of the mill trademark infringement claims. PRL is attempting to prevent Westchester from titling a magazine even though PRL itself sells no literary products. And Westchester acquired its "POLO" mark from and, at least in part for the continuation of, the official publication of the U.S. Polo

Association.  This Court agrees with the magistrate judge's finding of trademark infringement but concludes that the court may have erred in permanently enjoining Appellants from using the mark "Polo" for their lifestyle magazine.  We remand for further consideration of remedy, in particular for reconsideration of disclaimer relief.

**I.**

**FACTUAL & PROCEDURAL HISTORY**

PRL is a fashion and design business founded in 1967 by Ralph Lauren.  Lauren has built PRL into a multi-billion dollar company that sells wearing apparel, accessories, home furnishings, and fragrances.  In the last four years alone, PRL sold approximately four billion dollars wholesale value of products bearing various "Polo" trademarks.  PRL advertises extensively in newspapers, trade publications, and magazines.  Articles about PRL's products and Ralph Lauren himself have appeared in magazines as diverse as <u>Time</u>, <u>Financial World</u>, <u>Town & Country</u>, and <u>Vanity Fair</u>.

PRL has registered a number of trademarks with the Patent and Trademark Office ("PTO") that include the word POLO.  We will refer to these trademarks collectively as the "Polo Trademarks."  PRL does not possess a POLO trademark for use on a publication.  All the Polo Trademarks remain in effect, and several have become

incontestable under the Lanham Act. 15 U.S.C. § 1065. PRL contends that as a result of its thirty years of continuous and extensive use of the Polo Trademarks, these marks have become famous, and the word POLO has come to be closely identified with both Ralph Lauren and PRL.

Westchester Media Company publishes magazines and, until the summer of 1997, produced only specialty magazines such as "Cowboys & Indians." Westchester's general partner is Navasota, whose sole shareholder is John B. Goodman. An avid polo player, Goodman is captain of a top-ranked polo team that has represented the United States in the international Westchester Cup tournament. He has been a member of the United States Polo Association ("USPA") since 1989 and serves on the boards of two USPA committees. He is also on the board of directors of the Houston Polo Club, of which he was president in 1994 and 1995.

In May 1997, Westchester Media and Navasota Holding Company purchased the assets of POLO magazine, including its trademarks, from Fleet Street Publishing Company and its owner, Ami Shinitzky. Those trademark registrations were granted to Shinitzky and Fleet Street in 1992 and read as follows:

(1) Registration No. 1,691,432 for "POLO", a "magazine on

the subject of equestrian sports and lifestyles";

(2) Registration No. 1,677,088 for a "horse and rider design" for "magazine publication services", and the design which appears on the masthead of POLO magazine; and

(3) Registration No. 1,710,894 for "POLO Life", a "magazine dealing with equestrian sports and lifestyles."

The history of Ami Shinitzky's POLO Magazine is critical to this dispute. Shinitzky, a polo enthusiast and USPA member, founded POLO Magazine (the "Old POLO Magazine") in 1975. Until it was sold in 1997, the Old POLO Magazine was a special interest magazine that provided, in its own words, "an insider's view of the sport of polo and the international society and . . . traditions that surround it." In an August 1997 article on the history of the Old POLO Magazine, Shinitzky wrote that the magazine "hit its stride with a formulaic mixture of game coverage, personality and club profiles, rules, opinions, history and how-to and horsemanship articles." The magazine's advertising base was equally equine-focused, consisting primarily of horse medicines, equestrian products, and polo equipment. The USPA endorsed the Old POLO Magazine as its "official publication," and most of the magazine's 7,000 subscribers were members of the USPA who received the magazine as a benefit of membership.

4

Shinitzky's direction of Old POLO Magazine was marked by a peaceful coexistence with PRL. Soon after the magazine's founding, Shinitzky interviewed Ralph Lauren for the magazine. In the following years, PRL frequently advertised in the magazine, as did several other luxury goods manufacturers. At no point during Old POLO Magazine's existence did PRL complain about the magazine's use of the "Polo" mark.

Beginning in 1989, Shinitzky started publishing issues of the Old POLO Magazine with expanded "lifestyle" content under the title POLO Life. According to Westchester, issues with expanded lifestyle content were published in 1989, 1990, 1992, 1993, 1994, 1995, and early 1997. Describing one of these issues in 1989, the trade journal Ad Week wrote, "[Shinitzky's magazine bears] a striking resemblance to one of Lauren's ads. It's loaded with pictures of upscale people having a good time at country clubs. Shinitzky hopes to attract advertisers that want to reach just that crowd." PRL was aware of the Ad Week article but continued to advertise in the Old POLO Magazine.

Ad Week was not the only entity to find similarity between the Old Polo Magazine and PRL. According to Westchester, potential advertisers in Old POLO Magazine frequently asked whether there was some connection between Old POLO Magazine and PRL.

In 1992, Shinitzky obtained federal registration for POLO covering a "magazine on the subject of equestrian sports and lifestyles." In support of its application to the PTO, Fleet Street submitted two 1989 issues of the Old POLO magazine, one of which included a PRL advertisement. PRL filed no opposition to the title or description of the magazine. Shinitzky offered to sell the magazine and its registration to PRL in 1994 but received no response. In April 1998, the federal registration received by Shinitzky became incontestable.

In May 1997, Westchester purchased all assets of POLO Magazine from Fleet Street for approximately $400,000. Despite the Old POLO Magazine's lackluster financial performance -- it lost $1,400 in 1996 -- Westchester explained the purchase price by pointing to the goodwill and history behind Fleet Street's POLO mark and to the access the magazine provided to personalities in the world of polo. Westchester repeatedly testified that it bought the magazine intending to "re-launch" it in an effort to expand readership and broaden polo's appeal. Despite Shinitzky's attempt during the purchase negotiations to link the magazine with "Ralph Lauren's spectacular achievement with the name Polo," Westchester denied at trial any intent to infringe PRL's trademarks or to trade on PRL's reputation and goodwill.

6

After purchasing the Old POLO Magazine, Westchester "re-launched" the magazine in October 1997 under the name of POLO (the "New POLO Magazine"), while at the same time publishing a separate magazine called "Polo Players Edition." In contrast to Shinitzky's magazine, the new POLO Magazine carried the tagline "Adventure • Elegance • Sport." The re-launched magazine also changed its target audience and distribution methods. Westchester purchased the customer list from Neiman Marcus, one of PRL's largest retailers, and arranged for promotional materials for the New POLO Magazine to be mailed to these customers. Westchester then sent a free copy of the New POLO Magazine to almost one million Neiman Marcus customers. In promotional materials sent to prospective advertisers, Westchester wrote that the New POLO Magazine was "not about the sport, but rather about an adventurous approach to living life." The promotional materials also explained that the new magazine would be distributed not only to USPA members but also "on newstands, at hotels, resorts, and clubs." Westchester also chose fashion model Claudia Schiffer to appear on the cover of its inaugural issue. The previous year, Ms. Schiffer had been PRL's featured model in an extensive advertising campaign.

While re-making the image of POLO magazine, Westchester tried to maintain the old magazine's links with PRL. Shortly after purchasing POLO magazine, Westchester contacted PRL and secured a

7

meeting with Elizabeth Morris, a PRL advertising executive. On June 23, 1997, Westchester's Reid Slaughter met with Morris and made an advertising sales pitch. This pitch included two "mock-up" covers of the New POLO Magazine, neither of which was ever used for the New POLO Magazine. One cover depicted a horse, but Westchester did not put a horse on its cover until more than a year after the re-launch. Slaughter testified that Morris reacted positively to his presentation. PRL, however, asserts that Morris made a clear objection to the magazine's title.

After this meeting, Westchester continued to lobby PRL for advertising. In September 1997, PRL's advertising agency invited Westchester to "Magazine Week," an event that allowed select magazine "finalists" to pitch advertising deals to PRL. This invitation was rescinded two days after it issued, and on September 23, 1997, PRL formally objected to the title of the New POLO Magazine.

In response, Westchester filed this action, seeking a declaration that its use of the title "POLO" for its magazine on "equestrian sports and lifestyles" does not infringe PRL's "Polo" mark. PRL asserted counterclaims for trademark infringement, dilution and unfair competition under the Lanham Act and Texas law, and sought injunctive relief. The parties stipulated that all matters would be tried to a magistrate judge.

8

The magistrate judge first entered a preliminary injunction and required Westchester to disseminate a "disclaimer which states clearly that POLO Magazine has no affiliation, sponsorship, or association with Ralph Lauren, or any Polo Ralph Lauren entities." Westchester was ordered to display the disclaimer in a prominent place on the magazine's cover, on its masthead and on the magazine's table of contents page. In addition, it was required to notify subscribers and advertisers that its magazine is not affiliated with PRL, and to publish the disclaimer on all "promotional materials."

Following trial, the magistrate judge issued a lengthy decision finding that Westchester had violated the Lanham Act by infringing upon PRL's "Polo" trademark. In consequence, she issued a permanent injunction essentially requiring Westchester to cease and desist publishing New POLO Magazine under the title "POLO". Westchester appealed, and this Court stayed the permanent injunction and reinstituted the disclaimer procedure pending the appeal.

## II.

## DISCUSSION

Westchester appeals the finding of trademark infringement and the denial of its defenses of laches, acquiescence, and

9

trademark incontestability.  In addition, Westchester challenges the magistrate judge's analysis of PRL's counterclaim under the Federal Trademark Dilution Act ("FTDA").  Finally, Westchester appeals the permanent unqualified injunction forbidding its use of "POLO" to title its equestrian lifestyle magazine.  We will consider each issue in turn.

**A.  Trademark Infringement**

1. General Principles

To prevail on its trademark infringement claim, PRL must show that Westchester's use of the "Polo" mark creates a likelihood of confusion in the minds of potential consumers as to the "source, affiliation, or sponsorship" of Westchester's magazine. *See* Elvis Presley Enters., Inc. v. Capece, 141 F.3d 188, 193 (5th Cir. 1998); Society of Fin. Exam'rs v. National Ass'n of Certified Fraud Exam'rs, Inc., 41 F.3d 223, 227 (5th Cir. 1995); *see also* 15 U.S.C. §§ 1114(1), 1125(a)(1)(A).[1]  Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion. *See* Elvis Presley Enters., 141 F.3d at 193.

---

[1]     PRL also charged Westchester with unfair competition under Texas common law.  TEX. BUS. & COM. CODE § 16:29.  Likelihood of confusion is also the governing standard for PRL's unfair competition claim. Blue Bell Bio-Medical v. Cin-Bad, Inc., 864 F.2d 1253, 1261 (5th Cir. 1989).  The analysis of PRL's federal claim thus controls disposition of PRL's state law claim.

In determining whether a likelihood of confusion exists, courts consider the following nonexhaustive list of factors: (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion. *See* <u>Pebble Beach Co. v. Tour 18 Ltd.</u>, 155 F.3d 526, 543 (5th Cir. 1998); <u>Elvis Presley Enters.</u>, 141 F.3d at 194; <u>Conan Properties, Inc. v. Conans Pizza, Inc.</u>, 752 F.2d 145, 149 (5th Cir. 1985). No single factor is dispositive, and a finding of a likelihood of confusion does not require a positive finding on a majority of these "digits of confusion." *See* <u>Conan Properties</u>, 752 F.2d at 150; <u>Elvis Presley Enters.</u>, 141 F.3d at 194. The court is also free to consider other relevant factors in determining whether a likelihood of confusion exists. *See id*. at 194.

In the usual Lanham Act case, the presence of a likelihood of confusion disposes of the issue of infringement. But this case is not so simple. PRL is not trying to enjoin a purely commercial use of the "Polo" mark. Rather, it is trying to prevent Westchester from using "Polo" as a title for a magazine. In so doing, PRL's infringement claim implicates the First Amendment right to choose an appropriate title for literary works. See <u>Sugar</u>

11

Busters LLC v. Brennan, 177 F.3d 258, 269 n.7 (5th Cir. 1999)(noting a First Amendment interest in choosing an appropriate book title); Twin Peaks Productions, Inc. v. Publications Int'l, Ltd., 996 F.2d 1366, 1379 (2d Cir. 1993)(same).[2]

This case thus involves the tension between the protection afforded by the Lanham Act to trademark owners and the protection afforded by the First Amendment to expressive activity. In Rogers v. Grimaldi, 875 F.2d 994 (2d Cir. 1989), the Second Circuit ruled that this tension could not be resolved by allowing the First Amendment to insulate titles of artistic works from Lanham Act claims. *See* Rogers, 875 F.2d at 998. But neither could courts ignore First Amendment concerns when enforcing the Lanham Act. *Id.* Titles, according to the Rogers court, combine both artistic expression and commercial promotion, and they consequently require more First Amendment protection than the labeling of ordinary commercial products. *Id.* Finding that "overextension of Lanham Act restrictions in the area of titles might intrude on First Amendment values", *id.*, the court concluded that it "must construe the Lanham Act narrowly to avoid such a conflict." *Id.*,

---

[2]    We reject PRL's argument that book titles and magazine titles are distinguishable for First Amendment purposes. While it is true that both Sugar Busters and Twin Peaks involved book titles, book titles belong to the category of literary titles, a category which also includes magazine titles. *See* 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 10:1 (4th ed. 1998)[hereinafter MCCARTHY](explaining that the law of literary titles encompasses magazine titles).

12

citing <u>Silverman v. CBS</u>, 870 F.2d 40, 48 (2d Cir. 1989); *see also* <u>Cliff's Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.</u>, 886 F.2d 490, 494 (2d Cir. 1989).

Relying on <u>Rogers</u>, the Second Circuit has adopted the following framework when a trademark is used by another for a valid literary or artistic purpose: Literary titles do not violate the Lanham Act "'unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." <u>Twin Peaks Productions</u>, 996 F.2d at 1379, quoting <u>Rogers</u>, 875 F.2d at 999; *see also* <u>No Fear, Inc. v. Imagine Films, Inc</u>., 930 F.Supp. 1381, 1383 (D.C. Cal. 1995)(endorsing the <u>Rogers</u> approach). To determine whether an artistically relevant title misleads as to the source or content of the work, the Second Circuit applies the likelihood of confusion test used in evaluating standard trademark infringement claims. *See* <u>Twin Peaks Productions</u>, 996 F.2d at 1379. However, the likelihood of confusion must be "particularly compelling" to outweigh the First Amendment interests at stake. *Id.* This Circuit has adopted the Second Circuit's approach:

> Any finding that defendants' book title is likely to cause confusion with plaintiff's book title must be "particularly compelling" to outweigh defendants' First Amendment interest in choosing an appropriate book title for their work.

13

<u>Sugar Busters</u>, 177 F.3d at 269 n.7, citing <u>Twin Peaks Productions</u>, 996 F.2d at 1379.

The magistrate judge's finding of a likelihood of confusion is in this circuit a finding of fact reviewed for clear error. *See* <u>Elvis Presley Enters.</u>, 141 F.3d at 196. Under the clear error standard, we will reverse the district court only if we have a "definite and firm conviction that a mistake has been committed." <u>B.H. Bunn Co. v. AAA Replacement Parts Co.</u>, 451 F.2d 1254, 1260 (5th Cir. 1971)(internal quotation marks omitted).

2. <u>Analysis</u>

Westchester argues that the court improperly applied the "particularly compelling" standard mandated by <u>Sugar Busters</u>. Further asserting that the standard could not in any event be satisfied on this record, Westchester challenges as clearly erroneous the findings on several of the digits of confusion: that Westchester intended to infringe upon PRL's mark; that Westchester's and PRL's products were similar because magazines are within PRL's "natural zone of expansion;" and that the 1997 relaunch of the New POLO Magazine resulted in increased actual confusion. We consider each of these arguments in turn.

a. The <u>Sugar Busters</u> standard

Westchester argues that the trial court, improperly applying the <u>Sugar Busters</u> standard, based the finding of liability

14

on simple likelihood of confusion rather than a "particularly compelling" likelihood.[3] In discussing First Amendment interests, however, the magistrate judge explicitly held:

> Accepting, . . . without necessarily deciding, that <u>Sugar Busters</u> has 'raised the bar', in this circuit, in a trademark analysis, and requires that 'particularly compelling' circumstances exist before an injunction can issue in view of a first amendment objection, the court still finds such relief appropriate here.

<u>Westchester Media Co., L.P. v. PRL USA Holdings, Inc.</u>, 1999 U.S. Dist. LEXIS 12333, *177-78 (S.D.Tex. Aug. 4, 1999). The court then recapitulated the findings which formed the basis for this conclusion. Westchester would apparently require the court to state in so many words that it found a particularly compelling likelihood of confusion. But its argument is about the clarity rather than the substance of the court's opinion. The substance followed <u>Sugar Busters</u>.

Westchester next argues that even if the <u>Sugar Busters</u> standard is applied, there is insufficient evidence of a "particularly compelling" likelihood of confusion. In support of this argument, Westchester challenges several of the findings under the digits of confusion analysis, hoping to deconstruct piecemeal

---

[3] The magistrate judge did not decide the threshold matter whether Westchester's title bears some artistic relevance to the underlying magazine. There can be no question on this point, however. Though the New POLO Magazine contains articles on fashion and travel, it also contains articles specifically related to polo. In each issue, sections entitled "The Blue Book" and "Through the Monocle" report on polo tournaments, profile polo players and personalities, and provide other polo-related information. Furthermore, the magazine is the official publication of the USPA.

15

the ultimate finding of likelihood of confusion. Before considering Westchester's contentions, it is necessary to emphasize that the "particularly compelling" standard applies to the ultimate issue, not to the strength of the evidence on each of the subsidiary digits of confusion. Twin Peaks so depicted the standard: "[T]he finding of likelihood of confusion must be particularly compelling . . . ." Twin Peaks, 996 F.2d at 1379; *see also* Sugar Busters, 177 F.3d at 269 n.7.

b.   Westchester's intent

Westchester denies that, as the magistrate judge found, it intentionally aligned itself with PRL to confuse the consuming public as to the source of the New POLO Magazine.

An innocent intent in adopting a mark does not immunize an intent to confuse in the actual use of the mark. *See* Elvis Presley Enters., 141 F.3d at 203; *see also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 22 cmt. c (1995)[hereinafter RESTATEMENT]. In light of Goodman's history with and commitment to the sport of polo, the magistrate judge did not find that Goodman purchased the "Polo" mark with intent to trade on PRL's reputation and goodwill. *See* Westchester Media Co., 1999 U.S. Dist. LEXIS 12333, *58. The court did, however, find that Westchester's actual use of the "Polo" mark evidenced an intent to trade on PRL's reputation. The magistrate judge exhaustively reviewed evidence -- magazine covers,

16

editorial and advertising content, and customer surveys -- showing that the New POLO Magazine primarily covers affluent lifestyles, fashion, and travel rather than the sport of polo.  The evidence also supports an inference that, in deciding to publish both Polo Players Edition and the New POLO Magazine, Westchester was attempting to segregate lifestyle content from technical polo content in an attempt to trade on the lifestyle image already projected by PRL's "Polo" mark.  Certainly, other explanations for Westchester's decision to publish two polo-related magazines are possible.  But in the absence of strong reasons to prefer those alternative explanations -- none of which were found credible, *see id.* at *60 -- we cannot say that the court's characterization of Westchester's intent is clearly erroneous.

c.    Similarity of Products and Services

Ralph Lauren publishes no magazine or periodical, but the magistrate judge nonetheless found this digit of confusion in PRL's favor because magazines are within PRL's "natural zone of expansion."  *See* Westchester Media Co., 1999 U.S. Dist. LEXIS 12333, *46.  Westchester challenges this finding.  Similarity is a close question, but we cannot say that the magistrate judge clearly erred.

In general, "[t]he greater the similarity between products and services, the greater the likelihood of confusion."

17

<u>Exxon Corp. v. Texas Motor Exch. of Houston, Inc.</u>, 628 F.2d 500, 505 (5th Cir. 1980).  But direct competition between the parties' products is not required in order to find a likelihood of confusion.  *See* <u>Elvis Presley Enters.</u>, 141 F.3d at 202; *see also* 4 MᴄCᴀʀᴛʜʏ §§ 24:13-14.  When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection.  *See* <u>Elvis Presley Enters.</u>, 141 F.3d at 202.

The danger of affiliation or sponsorship confusion increases when the junior user's market is one into which the senior user would naturally expand.  *See* Rᴇꜱᴛᴀᴛᴇᴍᴇɴᴛ § 21(e) & cmt. j.  The actual intent of the senior user to expand is not particularly probative for this purpose.  *See* <u>Elvis Presley Enters.</u>, 141 F.3d at 202.  Instead, consumer perception is the controlling factor.  "'If consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely.'"  *Id.,* quoting Rᴇꜱᴛᴀᴛᴇᴍᴇɴᴛ § 21 cmt. j.

Following the applicable law, the court examined whether the consuming public could believe there is an association between PRL and the New POLO Magazine.  PRL has a strong presence not only in fashion marketing but across a spectrum of products.  The New POLO Magazine, with its emphasis on fashion, elegance, and affluent

18

lifestyles, appeals to the same markets in which PRL has a widespread identity.[4] Significantly, the noncompeting products of PRL and Westchester have been marketed to consumers in the same context (Neiman Marcus promotions). These facts led the court to find that there was a likelihood that consumers would believe that PRL is associated with New POLO Magazine.

Westchester dismisses the idea that magazines are a natural zone of expansion for PRL by emphasizing that no fashion designer has ever started a magazine. But whether PRL could ever successfully publish a magazine is not the issue here; consumer perception is the issue. This finding is not the court's most significant or unassailable one, but it is not clearly erroneous.

d.    Evidence of Actual Confusion

Westchester argues clear error in the finding that the 1997 "relaunch" of New POLO Magazine resulted in an increase in incremental confusion. In so doing, it is essentially challenging the survey results submitted by PRL and upon which the magistrate judge relied. *See* Westchester Media Co., 1999 U.S. Dist. LEXIS 12333, *96.

---

[4]    It is irrelevant to the questions of similarity or "natural zone of expansion" that PRL advertises in magazines.

19

Westchester attacks PRL's survey principally on grounds that it used a faulty control.[5] According to Westchester, PRL's survey was flawed because it did not distinguish between actionable confusion produced by the New POLO Magazine and permissible confusion attributable to the Old POLO Magazine. Westchester argues that the survey should have used the Old POLO Magazine as a control rather than Polo Players Edition. This would have effectively isolated the variable at issue here, which is the change in the look of the relaunched magazine, not the name. By using Polo Players Edition as a control, another variable was admitted -- the name of the magazine -- which meant that the one variable at issue, the magazine's new look, could not be isolated, and the incremental confusion attributable solely to the magazine's new look could not be determined. In other words, some of the incremental confusion could have been attributed to the different names, Polo Players Edition and POLO.

Westchester's argument makes sense, but it is not so compelling as to produce clear error in the court's reliance on PRL's survey for evidence of incremental confusion. This is because the magistrate judge found that Polo Players Edition is the continuation of Old POLO Magazine. It would have been preferable for the PRL survey to use the Old POLO Magazine as a control. But

---

[5] For a detailed explanation of how PRL's survey worked, *see* Westchester Media Co., 1999 U.S. Dist. LEXIS 12333, *88-91.

20

Polo Players Edition is not so different from the Old POLO Magazine as to make it clearly erroneous to rely on PRL's survey. In addition, trademark law is concerned with the level of actual confusion in the current marketplace. Consumers today are exposed to Polo Players Edition, not the Old POLO Magazine. These two magazines now define the difference between permissible and actionable confusion.

d.    <u>Weighing the digits of confusion</u>

Because we have found no clear error in the digits of confusion challenged by Westchester, and because the magistrate judge's findings on the remaining digits were unchallenged, we must conclude that a likelihood of confusion exists between New POLO Magazine and the PRL marks.[6]

As has been discussed, Westchester's First Amendment interest in choosing a title for its magazine requires a particularly compelling likelihood of confusion. <u>Sugar Busters</u>, 177 F.3d 269 n.7. This finding, too, is supported by the record. Westchester's New POLO Magazine and PRL's products target the same consumers and on occasion use the same retail outlets. The New POLO Magazine's emphasis on fashion, affluent lifestyle, and travel

---

[6]    Westchester left unchallenged: the type of mark infringed (strong), the similarity between the two marks, the identity of the retail outlets and purchasers, and the identity of the advertising media used. *See* <u>Elvis Presley Enters.</u>, 141 F.3d at 200 (accepting the district court's findings on the digits of confusion that were not challenged by the parties).

can plausibly lead consumers to believe that PRL is associated with the New POLO Magazine. Buttressing these core findings is the evidence of actual confusion, both anecdotal and survey-based, and Westchester's intent to trade on PRL's goodwill and reputation. Unless one of Westchester's defenses prevails, the appellants have infringed upon PRL's marks.

**B. Defenses**

Westchester's defenses are based on laches, acquiescence and the incontestability of its trademark.

1. <u>Laches</u>

"Laches is commonly defined as an inexcusable delay that results in prejudice to the defendant." <u>Conan Properties</u>, 752 F.2d at 153. Laches comprises three elements: (1) delay in asserting one's trademark rights, (2) lack of excuse for the delay, and (3) undue prejudice to the alleged infringer caused by the delay. <u>Elvis Presley Enters.</u>, 141 F.3d at 205.

The trial court ruled that Westchester established none of these elements. There was no delay because the New POLO Magazine "is an entirely new product and different from the Old POLO Magazine in most aspects," a finding we have upheld. *See* <u>Westchester Media Co.</u>, 1999 U.S. Dist. LEXIS 12333, *196. PRL's long familiarity with the Old POLO Magazine -- in 1975, Ralph Lauren granted Ami Shinitzky an exclusive interview for Old POLO

22

Magazine -- was therefore immaterial to its objections to the New POLO Magazine. The court found that PRL registered its written objections with Westchester at the latest in its cease and desist letter of September 26, 1997, not an unreasonable amount of time from the June meeting between Westchester's then-publisher Reid Slaughter and PRL's Liz Morris. *See id*. at *195.

Westchester challenges the laches findings by repeatedly pointing to its trademark registration for an "equestrian sports and lifestyles" magazine, in effect since 1975, and noting that both the old and the new POLO magazines fit this description. It follows, according to Westchester, that if PRL ever had a claim against a magazine titled "Polo", it ripened in 1975 or at the time of Ralph Lauren's interview in the Old POLO Magazine, or no later than 1989 when Shinitzky launched the first of his issues with expanded lifestyle content. While it may be true that both the old and new POLO magazines concern "equestrian sports and lifestyles", Westchester's argument fails to crack the essential barrier to relief -- the court's finding that New POLO Magazine is not a continuation of Old POLO Magazine but is in fact a different entity.[7]

_____

[7] The magistrate judge also did not clearly err in dismissing Westchester's argument of undue prejudice -- in the amount of $1.3 million -- by PRL's delay in objecting to the New POLO Magazine. PRL cannot be held responsible for Westchester's investment prior to its learning about the planned launch of the New POLO Magazine; any investment made by Westchester after PRL objected to Westchester's use of its trademark was made at Westchester's risk.

23

## 2. <u>Acquiescence</u>

Westchester contends that PRL's failure to object to its relaunch efforts at the June 1997 meeting between Slaughter and PRL's Morris constituted an implicit assurance that induced reliance. <u>Conan Properties</u>, 752 F.2d at 153. The argument is unpersuasive, inasmuch as Westchester has not successfully challenged the trial court's finding that Westchester misled Morris about the extent of the new venture. Under these circumstances, PRL did not legally acquiesce in the use of the mark on New POLO Magazine.

## 3. <u>Incontestability</u>

Westchester asserts that pursuant to § 33(b) of the Lanham Act, its incontestable registration for the mark "Polo" on or in connection with a "magazine on the subject of equestrian sports and lifestyles" conclusively proves its right to publish the New POLO Magazine. Westchester's argument presumes, however, that the registration it purchased covers New POLO Magazine.

Section 33(b) provides that an incontestable registration is conclusive evidence of:

> the exclusive right to use the mark on or in connection with the goods or services specified in the affidavit filed under the provisions of section 15.

15 U.S.C. § 1115(b). A mark becomes incontestable through five years' continuous use following federal registration and compliance

---

*See* <u>Conan Properties</u>, 752 F.2d at 151-52.

with statutory formalities.  15 U.S.C. § 1065.  An incontestable mark is subject to challenge only under limited circumstances including the prior use defense of § 1065.[8]  The parties argue at length over the relatively novel issue of the scope of PRL's rights as a prior user.[9]  It is unnecessary to address that issue, however, because Westchester's incontestability argument first runs afoul of the finding that Old POLO and New POLO magazines are different products.  Hence, New POLO had not been published for the statutory minimum five years when PRL challenged appellants' use of the mark.

Westchester contends that New POLO, like its predecessor, is a "magazine on the subject of equestrian sports and lifestyles".  As both magazines fit this literal description of the mark under which they were registered, the mark is incontestable for "goods . . . specified in the affidavit filed under . . . section 15."  Such a literal application of § 1115 has some appeal, but it ignores the district court's finding that the two magazines are not the same

---

[8]   15 U.S.C. § 1115(b) lists eight defenses to an incontestable mark, none of which applies here, and MCCARTHY identifies a few others.  5 MCCARTHY § 32:147.

[9]   Section 15 of the Lanham Act, 15 U.S.C. § 1065, specifies the prior use defense, as it provides in pertinent part that a mark registered and supported by the proper affidavits is incontestable

> except to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of the publication under this chapter of such registered mark.

25

product.  A federal registration does not create the trademark; the trademark is acquired by use.  *See* 3 McCarthy § 19:3; <u>Volkswagenwerk Aktiengesellschaft v. Wheeler</u>, 814 F.2d 812, 819 (1st Cir. 1987).  The incontestable "Polo" mark was used to title a magazine about the sport of polo, and cannot be transferred to a fundamentally different magazine.  Thus, the incontestability of the mark as applied to Old POLO Magazine does not shield New POLO from attack.

## C.  The Federal Trademark Dilution Act

PRL alleges dilution of its "Polo" mark under 15 U.S.C. § 1125(c)(3), the Federal Trademark Dilution Act ("FTDA"), which became effective January 1996.[10]  The magistrate judge declined to rule on this claim, finding that the Fifth Circuit had not yet addressed the standards governing relief under the FTDA and noting that PRL's requested relief was the same as that ordered in the infringement action.  *See* <u>Westchester Media Co.</u>, 1999 U.S. Dist. LEXIS, 12333, *138.  This court must reach the claim, however, as it potentially affords a distinct basis of equitable relief.[11]

---

[10]  PRL also claimed dilution under Texas state law.  Tx. Bus. & Com. Code § 16:29.  The magistrate ruled, however, that this claim was pre-empted by Westchester's federal registration of the "Polo" mark.  *See* <u>Westchester Media Co.</u>, 1999 U.S. Dist. LEXIS 12333, *128-29.  Neither party challenges this ruling, and we will leave it undisturbed.

[11]  Contrary to Westchester's position, this case does not involve impermissible retroactive application of the FTDA.  PRL's dilution claim is based on Westchester's continuing use of the "Polo" mark after enactment of the FTDA.  See <u>Viacom Inc. v. Ingram Enters., Inc.</u>, 141 F.3d 886, 889 (8th Cir. 1998).

26

Under the FTDA, the owner of a "famous mark" is protected "against another person's commercial use . . .of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1). The FTDA defines dilution as:

> the lessening of the capacity of a famous mark to identify and distinguish goods and services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception.

15 U.S.C. § 1127. Injunctive relief may be ordered for a violation, but if a willful violation is proved, the remedy may include restitutionary, compensatory, or specific relief in the form of destruction of offending articles. Id. §§ 1125(c)(1)-(2), 1117(a), 1118.

To prevail on its dilution claim, PRL must prove that its marks are famous and distinctive; that Westchester adopted its mark after PRL's had become famous and distinctive; and that Westchester caused dilution of PRL's mark.[12] *See* 15 U.S.C. §§ 1125(c)(1), 1127;

---

[12]    There are two recognized forms of dilution: blurring and tarnishment. *See* Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Division of Travel Development, 170 F.3d 449, 452 (4th Cir. 1999)(noting that the FTDA's legislative history indicates congressional understanding that dilution results from blurring or tarnishment). Blurring involves "'the gradual whittling away or dispersion of the identity and hold upon public mind of the mark or name by its use upon noncompeting goods.'" Elvis Presley Enters., Inc. v. Capece, 950 F.Supp. 783, 798 (S.D. Tex. 1996), quoting Frank I. Schecter, The Rational Basis of Trademark Protection, 40 Harv. L. Rev. 813, 825 (1927). Tarnishment results when one party uses another's mark in a manner that tarnishes or appropriates the goodwill and reputation associated with the mark. *See* MCCARTHY §§ 24:67-69. PRL alleges that New POLO Magazine both blurs and tarnishes its "Polo" mark.

27

Ringling Bros., 170 F.3d at 452. The parties do not contest the first two of these requirements. Rather, they dispute whether proof of dilution requires a showing of actual or merely threatened economic harm. Westchester, relying on a recent Fourth Circuit opinion, argues that proof of dilution under the FTDA requires proof of "actual, consummated harm." Ringling Bros., 170 F.3d at 464.[13] PRL counters with a Second Circuit opinion holding that the FTDA requires only proof of a likelihood of dilution. *See* Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 224-25 (2d Cir. 1999).[14]

As an issue of first impression in this Circuit,[15] we endorse the Fourth Circuit's holding that the FTDA requires proof of actual harm since this standard best accords with the plain meaning of the statute. There is a key difference between the state antidilution statutes that formed the backdrop for passage of the FTDA and the FTDA itself. Whereas state antidilution statutes incorporate, often expressly, the "likelihood of dilution"

---

[13] Several courts outside the Fourth Circuit have followed the standard of proof announced in Ringling Bros.. *See* Playboy Enters., Inc. v. Netscape Communications, 55 F.Supp. 2d 1070 (C.D. Cal. 1999); American Cyanamid Co. v. Nutraceutical Corp., 54 F.Supp. 2d 379 (D.N.J. 1999).

[14] At least one court outside the Second Circuit has agreed with Nabisco. *See* Eli Lilly and Co. v. Natural Answers, Inc., 86 F.Supp. 2d 834, 852 (S.D. Ind. 2000).

[15] Fifth Circuit courts have encountered FTDA claims but have either declined to rule on them, *see* Sunbeam Products, Inc. v. West Bend Company, 123 F.3d 246, 261 n. 28 (5th Cir. 1997), or have avoided an analysis of the new Act, *see* Elvis Presley Enters., 950 F.Supp. at 797 (using New York's antidilution statute as a guide to interpreting the FTDA).

28

standard,[16] the federal statute does not.  See Ringling Bros., 170 F.3d at 461.  Instead, it prohibits any commercial use of a famous mark that "causes dilution."  15 U.S.C. § 1125(c)(1).  Both the present tense of the verb and the lack of any modification of "dilution" support an actual harm standard.[17]

Several persuasive contextual indicators were also pointed out by the Fourth Circuit.  For instance, the conduct proscribed under the FTDA is "another person's . . . use," 15 U.S.C. § 1125(c)(1), not merely threatened use of the mark.  *See* Ringling Bros., 170 F.3d at 461.  In addition, "unlike the state antidilution statutes which provide only injunctive relief, reflecting their sole focus on the prevention of future harm, the federal Act provides that where willful conduct is shown, compensatory and restitutionary relief may be awarded--for necessarily consummated economic harm.  15 U.S.C. §§ 1125(c)(2), 1117(a), 1118."  *Id.*

---

[16]  *See, e.g.*, TEX. BUS. & COM. CODE §16.29 ("A person may . . . enjoin an act likely to . . . dilute the distinctive quality of a mark . . . ."); N.Y. GEN. BUS. LAW § 360-1 ("Likelihood of . . . dilution of the distinctive quality of a mark shall be a ground for injunctive relief . . . ."); CAL. BUS. & PROF. CODE § 14330 (same).

[17]  Commentators have noted this key difference between the federal dilution act and its state counterparts. *See, e.g.*, Robert N. Klieger, Trademark Dilution: The Whittling Away of the Rational Basis for Trademark Protection, 58 U. Pitt. L. Rev. 789, 840 (1997)("In place of the 'likelihood of dilution' language of the state antidilution statutes, the [federal Act] . . . creates an actual dilution requirement . . . ."); *see also* Ringling Bros., 170 F.3d at 461 n. 6.

The <u>Nabisco</u> opinion asserts that an actual harm standard allows "excessive literalism to defeat the intent of the statute." *See* <u>Nabisco</u>, 191 F.3d at 224. But in the absence of any authority stating that Congress intended a "likelihood of dilution" standard for the FTDA, we may not depart from the plain meaning of the statute.

The magistrate judge reviewed the current and projected circulation for the New POLO Magazine, and found that PRL made no showing of actual harm. *See* <u>Westchester Media Co.</u>, 1999 U.S. Dist. LEXIS, 12333, *142. Because we have concluded that the FTDA requires proof of actual dilution, this finding, which we cannot say was clearly erroneous, dooms PRL's dilution claim.

### III.

#### REMEDIES

The magistrate judge entered a broad injunction ordering Westchester to cease publishing the New POLO Magazine under the name POLO. On appeal, the parties have staked out diametrically opposed positions concerning the First Amendment ramifications of the injunction and the availability and advisability of a narrower disclaimer remedy. Rather than respond to these adversarially charged arguments, however, this discussion will explain certain misconceptions that influenced the magistrate judge's decision to adopt broad rather than targeted injunctive relief. In brief, the

30

magistrate judge unduly discounted the First Amendment interests impaired by the injunction and, despite an otherwise heroic effort in unraveling this case, failed to accommodate its distinctive features.

This court reviews injunctive relief in trademark cases as in other cases under the abuse of discretion standard. *See* Pebble Beach Co., 155 F.3d at 550. An abuse of discretion automatically inheres in an injunctive decree if the trial court misinterpreted applicable law. *See* Peaches Entertainment Corp. v. Entertainment Repertoire Assocs., Inc., 62 F.3d 690, 693 (5th Cir. 1995). As with injunctive relief generally, an equitable remedy for trademark infringement should be no broader than necessary to prevent the deception. *See* Soltex Polymer Corp. v. Fortex Industries, Inc., 832 F.2d 1325, 1329 (2d Cir. 1987); Better Business Bureau, Inc. v. Medical Directors, Inc., 681 F.2d 397, 405 (5th Cir. 1982).

The magistrate judge concluded that the rights of a trademark owner need not yield to First Amendment concerns "where a defendant has alternative avenues of communication available." Westchester Media Co., 1999 U.S. Dist. LEXIS 12333, *173, citing Reddy Communications, Inc. v. Environmental Action Foundation, Inc., 1977 U.S. Dist. LEXIS 12968, 199 U.S.P.Q. 630, 634 (D.D.C.

31

1977).[18]  The alternative avenue is Westchester's publishing its lifestyle magazine under any title other than POLO.  Even if that is all the injunction ordered, a point to be discussed later, the magistrate judge too abruptly dismissed First Amendment concerns. For one thing, several circuit courts have rejected the <u>Reddy Communications</u> approach, holding instead that even where trademark infringement has been found, First Amendment interests should influence the choice of remedy.  *See* <u>L.L. Bean, Inc. v. Drake Publishers, Inc.</u>, 811 F.2d 26 (1st Cir. 1987); <u>Consumers Union of the United States, Inc. v. General Signal Corp.</u>, 724 F.2d 1044 (2d Cir. 1983).  And on its own terms, the reasonable alternative avenues approach bears a tenuous relation to communicative and property interests embodied in trademarks.  *See* <u>L.L. Bean</u>, 811 F.2d at 29; *see also* Robert C. Denicola, <u>Trademarks as Speech: Consitutional Implications of the Emerging Rationales for the Protection of Trade Symbols</u>, 1982 Wis. L. Rev. 158, 197 (1982). More to the point, as this court has already been committed to exercising sensitivity for First Amendment interests where

---

[18]    Other cases cited by the magistrate judge, <u>Mutual of Omaha Ins. Co. v. Novak</u>, 836 F.2d 397, 402 (8th Cir. 1987) and <u>Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.</u>, 600 F.2d 1184, 1188 (5th Cir. 1979), essentially make the same argument as the language from <u>Reddy Communciations</u> -- that the First Amendment does not give "license" to infringe upon trademark rights. <u>Westchester Media Co.</u>, 1999 U.S. Dist. LEXIS 12333, *167, *172.   Though <u>Scoreboard Posters</u> involved copyright law (and arguably should not be cited in a trademark opinion), both it and <u>Novak</u> rely on the same authority as <u>Reddy Communications</u> and belong to the same line of cases, the so-called "adequate alternative" cases.  Thus, our rejection of reasoning behind <u>Reddy Communications</u> is also a rejection of these other two cases.

trademark violations are asserted, we are bound by our precedent rather than by Reddy Communications.  *See* Better Business Bureau, 681 F.2d at 404-05 (reviewing the scope of an injunction for compliance with the First Amendment).

The magistrate judge also labeled Westchester's title "commercial speech", suggesting that it deserves less First Amendment protection for that reason.  Westchester Media Company, 1999 U.S. Dist. Lexis 12333, *170.  As has been previously noted, a magazine title is a hybrid between commercial and artistic speech.  *See* Rogers, 875 F.2d at 998.  Here, the speech is expressive to an appreciable degree, and it requires more protection than the labeling of ordinary commercial products.  *Id*.

Insofar as the purpose of a remedy for trademark infringement is to eliminate the likelihood of confusion between the holder of the mark and the interloper, the remedy might in a particular case require suppression of otherwise constitutionally protected speech.  *See, e.g.*, Dr. Suess Enters., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394 (9th Cir. 1997); Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200 (2d Cir. 1979).  Like fraudulent speech, speech that misleads or creates confusion is not protected under the First Amendment.  *See* Better Business Bureau, 681 F.2d at 404.  Where the allegedly infringing speech is at least partly literary or artistic, however, and not

33

solely a commercial appropriation of another's mark, the preferred course is to accommodate trademark remedies with First Amendment interests. One obvious mode of accommodation is a disclaimer that will officially dissociate the junior user of the mark from the senior user's product. Disclaimers have frequently been approved by this court and others when trademark and First Amendment interests intersect. *See, e.g.*, <u>Better Business Bureau</u>, 681 F.2d at 405; <u>Consumers Union</u>, 724 F.2d at 1053; <u>Twin Peaks Productions</u>, 996 F.2d at 1379.[19] Even in this case, the court issued a preliminary injunction requiring Westchester to publish the New POLO magazine with a disclaimer of any relation to PRL.

When the court ultimately rejected a disclaimer, it took insufficient account of Westchester's continuing First Amendment interests -- in both the use of the title and content of its ongoing publication -- and failed to implement the general rule that an equitable remedy should be no broader than the scope of the violation.

Unlike the magistrate judge, we are persuaded for several reasons that a broad injunction may be unnecessary to remedy the

---

[19]    Other cases have disallowed a disclaimer remedy after a fact-specific conclusion that it would be ineffective. *See, e.g.,* <u>Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Mfg, Inc.</u>, 510 F.2d 1004, 1013 (5th Cir. 1975). Neither these cases, nor others in which a disclaimer has been rejected without a discussion of First Amendment interests, *e.g.*, <u>Playboy Enters., Inc. v. Chuckleberry Publishing, Inc.</u>, 687 F.2d 563, 571 (2d Cir. 1982), should be understood to defeat the use of disclaimers where they would be effective to accommodate conflicting legal principles.

source confusion and will therefore remand for further factual development.

First, in this unusual case, it is undisputed that Westchester has the right to publish some magazine under the title POLO. The remedial injunction acknowledges this fact: it attempts to prohibit use of the title on New POLO magazine while allowing Westchester to publish Polo Players Edition, the sport-centered periodical, as POLO. The injunction, although deceptively simple in concept, would in practice pose a continual threat of substantive editing to the magazine, because the editorial line between the publications is not clear. Old POLO magazine, the forerunner of Polo Players Edition, contained lifestyle advertising by manufacturers like PRL. Further, it is perfectly consistent with the theme of a polo sport-centered periodical to include such articles as profiles of celebrity players and supporters of polo or features concerning venues where polo is played. And unless Westchester confined POLO (formerly Polo Players Edition) to distribution to the members of the USPA, arguments could arise whether the appellant breached the scope of the injunction by seeking a broader circulation and hence a wider audience for the sport. The content-based impact of this injunction could extend beyond the title of Westchester's magazine, posing special First Amendment concerns.

35

Second, and also unique to this case, is PRL's claim to police use of the "Polo" mark by the publisher of USPA's official magazine. PRL products became famous by basking in the reflected glow of an elegant sport. PRL now asserts that it, not the sport, is the source of the glow. While PRL's primary claim is the essence of the ordinary trademark case, we cannot be blind, when balancing the equities, to the fact that PRL is arrogating the very name of a sport from the players' publication. In a sense, PRL is biting the hand that fed it.

Third, it is possible that a limited injunction containing disclaimer relief could be an effective remedy. PRL, despite strong incentive to do so, offered no evidence of actual confusion after the preliminary injunction ordered New POLO published with disclaimers. *See* Westchester Media Co., 1999 U.S. Dist. LEXIS 12333, *224. The magistrate judge speculated that the absence of confusion was due to publicity surrounding this lawsuit rather than to the disclaimers. Speculation has no evidentiary weight, however. The magistrate judge also found that the survey evidence submitted by Westchester proved that the disclaimer was ineffective in alleviating source confusion. *See* Westchester Media Co., 1999 U.S. Dist. LEXIS 12333, *237-38. But the survey results were not necessarily entitled to more weight than the lack of actual confusion following the dissemination of disclaimers. A

36

lack of actual confusion, though not determinative, is relevant to the fashioning of relief. *See* 3 MCCARTHY § 23:18. In any event, the effectiveness of a disclaimer remedy, being considered at the end of a long trial, was not thoroughly explored. On remand, the parties can draw from the experience of New POLO's publication with a disclaimer pending this appeal.

Fourth, the markets for both PRL's products and Westchester's magazine consist of relatively sophisticated buyers. *See* Soltex Polymer Corp., 832 F.2d at 1330 (the presence of sophisticated consumers weighs in favor of disclaimer relief). Such buyers are more likely to notice, read, and understand the import of any written disclaimers attached to Westchester's magazine. *See* Times Mirror Magazines, Inc. v. Las Vegas Sports News, 2000 WL 526779, *10 (3d Cir. Apr.28, 2000) ("Unsophisticated buyers . . . are more vulnerable to confusion, mistake, and misassociations against which the trademark protects").

In requiring disclaimer relief to be reconsidered, we reject the court's additional reasons for rejecting that remedy. The court held that Westchester waived any disclaimer argument by its omission from the pretrial order.[20] Read in context, the record

---

[20] Westchester Media Co., 1999 U.S. Dist. LEXIS 12333, *233-34 ("[A] joint pretrial order signed by both parties . . . governs the issues in evidence to be presented at trial. . . . [I]f a claim or issue is omitted from the order, it is waived," citing Elvis Presley Enters., 141 F.3d at 206 (citations omitted)).

37

does not support waiver. After all, the court itself introduced disclaimer relief into this case by ordering it in the preliminary injunction. The court also admitted evidence on the effectiveness of a disclaimer remedy. More important, courts in trademark cases have a responsibility to tailor the relief to the violation, a responsibility that includes consideration of disclaimers. Appellate courts have a similar responsibility and have reviewed the breadth of injunctive relief in the face of similar waiver arguments. *See* Allard Enterprises, Inc. v. Advanced Programming Resources, Inc., 146 F.3d 350, 360 (6th Cir. 1998); Sovereign Order of Saint John of Jerusalem, Inc. v. Grady, 119 F.3d 1236, 1241 (6th Cir. 1997).

The court also expressed skepticism that Westchester, after violating the preliminary injunction order, could not be trusted to adhere to a disclaimer. *See* Westchester Media Co., 1999 U.S. Dist. LEXIS 12333, *234. Although Westchester's track record of compliance was relevant to permanent disclaimer relief, the errors cited by the court were minor. Westchester was accused, not of refusing to disseminate the disclaimer, but of making it inconspicuous. *See id.* at *228-29. Westchester's alleged noncompliance was apparently not serious enough for PRL to complain about before trial -- except for a complaint about the language of a disclaimer letter that Westchester promptly changed. Westchester

38

also posted disclaimer stickers on an issue of magazines published without the necessary language. It was not alleged that PRL was hurt as a result of Westchester's behavior; on the contrary, the court acknowledged that there were no reports of actual confusion after the disclaimer was ordered. *See id.* at *224.[21]

Similarly, the discovery abuses cited by the court are inadequate to bar disclaimer relief. If such abuses were not serious enough to warrant the adverse inferences PRL asked for during trial, *see id.* at *230-31, then they do not warrant an overbroad injunction.

Finally, we reject the district court's repeated invocations of the "safe distance" line of cases in order to justify imposing a broad injunction.[22] In Better Business Bureau, this court faced facts analogous to those here and disapproved of the "safe distance" principle where First Amendment interests are at stake. *See* Better Business Bureau, 681 F.2d at 404-05.

---

[21] This is not to say that if Westchester persistently failed to post proper disclaimers on the magazine, a narrow injunctive order would remain appropriate.

[22] *See* Westchester Media Co., 1999 U.S. Dist. LEXIS 12333, *236 ("In deciding whether to order an injunction, it is important to remember that in fashioning relief against [the infringing] party . . . , a court of equity is free to proscribe activities that standing alone, would have been unassailable," citing Pebble Beach Co., 155 F.3d at 550); *see also id.* at *241-42 (citing Conan Properties, 752 F.2d at 153, for the same proposition: that courts can issue broad injunctions prohibiting infringing conduct as well as conduct that would not usually justify relief).

Because the court thus erred in too readily dismissing the possibility of a disclaimer or other limited injunctive relief, we must remand for further factual development and for reconsideration whether a disclaimer procedure better comports with First Amendment principles than an outright prohibition on Westchester's use of "Polo" for New POLO Magazine. In other words, as this court concluded in <u>Better Business Bureau</u>, the appropriate remedy may be "not less speech, but more."

## IV.

For the foregoing reasons, the judgment of the court is **AFFIRMED in PART** on liability, but **VACATED and REMANDED in PART** on the question of the appropriate remedy.

Pending a final order on remand in the trial court, this court's injunction pending appeal, which continued the disclaimer order of the magistrate judge, will remain in effect.