IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
No. 98-11003

LYONS PARTNERSHIP,

Plaintiff-Appellant,

versus

TED GIANNOULAS, doing business
as Famous Chicken; TFC, INC.,

Defendants-Appellees.
_____

Appeals from the United States District Court for the
Northern District of Texas
_____

July 7, 1999

Before REAVLEY, JOLLY, and EMILIO M. GARZA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Lyons Partnership LP ("Lyons"), the owners of the rights to the children's caricature Barney, sued Ted Giannoulas, the creator of a sports mascot--The Famous Chicken ("the Chicken")--because the Chicken had incorporated a Barney look-alike in its act. The district court granted summary judgment to Giannoulas and awarded attorneys' fees.

On appeal, Lyons raises six issues, the most important of which is whether the district court erred when it determined that there was insufficient evidence that Giannoulas's use of the Barney

trademark caused consumer confusion under the Lanham Act.[1]  Because we agree with the approach taken by the district court, we affirm.

I

This case involves a dispute over the use of the likeness of "Barney," a children's character who appears in a number of products marketed to children.[2]  Barney, a six-foot tall purple "tyrannosaurus rex," entertains and educates young children.  His awkward and lovable behavior, good-natured disposition, and renditions of songs like "I love you, you love me," have warmed the hearts and captured the imaginations of children across the United States.  According to Lyons, the owner of the intellectual property rights for Barney and the plaintiff in the suit below, the defendants--Giannoulas d/b/a The Famous Chicken and TFC, Inc. ("TFC"), the owner of the intellectual property rights to the Chicken--sought to manipulate Barney's wholesome image to accomplish their own nefarious ends.

The Chicken, a sports mascot conceived of and played by Giannoulas, targets a more grown-up audience.  While the Chicken

---

[1]We have reviewed the other issues raised by Lyons and, after a consideration of the arguments made on appeal and a review of the briefs and the record, find no reversible error.

[2]These items include television shows, videotapes, books, magazines, music albums, and plush dolls.  In addition, a person dressed in a Barney costume has made public appearances at numerous events, including inaugural balls at both of President Clinton's inaugurations, a Red Sox game (where Barney threw the first pitch), and a public appearance with Nelson Mandela.

does sell marketing merchandise, it is always sold either by direct order or in conjunction with one of the Chicken's appearances. Thus, the Chicken's principal means of income could, perhaps loosely, be referred to as "performance art." Catering to the tastes of adults attending sporting events, most notably baseball games, the Chicken is renowned for his hard hitting satire. Fictional characters, celebrities, ball players, and, yes, even umpires, are all targets for the Chicken's levity. Hardly anything is sacred.

And so, perhaps inevitably, the Chicken's beady glare came to rest on that lovable and carefree icon of childhood, Barney. Lyons argues that the Chicken's motivation was purely mercenary. Seeing the opportunity to hitch his wagon to a star, the Chicken incorporated a Barney look-alike into his acts. The character, a person dressed in a costume (sold with the title "Duffy the Dragon") that had a remarkable likeness to Barney's appearance, would appear next to the Chicken in an extended performance during which the Chicken would flip, slap, tackle, trample, and generally assault the Barney look-alike.

The results, according to Lyons, were profound. Lyons regales us with tales of children observing the performance who honestly believed that the real Barney was being assaulted. In one poignant account related by Lyons, a parent describes how the spectacle brought his two-year-old child to tears. In fact, we are told,

only after several days of solace was the child able to relate the horror of what she had observed in her own words--"Chicken step on Barney"--without crying. After receiving such complaints from irate parents who attended the Chicken's performances with their children, Lyons sought to defend this assault on their bastion of child-like goodness and naiveté.

Giannoulas offers a slightly different perspective on what happened. True, he argues, Barney, depicted with his large, rounded body, never changing grin, giddy chuckles, and exclamations like "Super-dee-Dooper!," may represent a simplistic ideal of goodness. Giannoulas, however, also considers Barney to be a symbol of what is wrong with our society--an homage, if you will, to all the inane, banal platitudes that we readily accept and thrust unthinkingly upon our children. Apparently, he is not alone in criticizing society's acceptance of a children's icon with such insipid and corny qualities. Quoting from an article in The New Yorker, he argues that at least some perceive Barney as a "pot-bellied," "sloppily fat" dinosaur who "giggle[s] compulsively in a tone of unequaled feeblemindedness" and "jiggles his lumpish body like an overripe eggplant." The Talk Of The Town: Pacifier, The New Yorker, May 3, 1993 at 37. The Internet also contains numerous web sites devoted to delivering an anti-Barney message.[3]

_____

[3]One Internet search service provides a list of links to anti-Barney web sites, many of which contain warnings like the

Giannoulas further notes that he is not the only satirist to take shots at Barney. Saturday Night Live, Jay Leno, and a movie starring Tom Arnold have all engaged in parodies at the ungainly dinosaur's expense.

Perhaps the most insightful criticism regarding Barney is that his shows do not assist children in learning to deal with negative feelings and emotions. As one commentator puts it, the real danger from Barney is "denial: the refusal to recognize the existence of unpleasant realities. For along with his steady diet of giggles and unconditional love, Barney offers our children a one-dimensional world where everyone must be happy and everything must be resolved right away." Chala Willig Levy, <u>The Bad News About Barney</u>, Parents, Feb. 1994, at 191-92 (136-39).

Giannoulas claims that, through careful use of parody, he sought to highlight the differences between Barney and the Chicken. Giannoulas was not merely profiting from the spectacle of a Barney look-alike making an appearance in his show. Instead, he was engaged in a sophisticated critique of society's acceptance of this ubiquitous and insipid creature. Furthermore, Giannoulas argues that he performed the sketch only at evening sporting events.

The sketch would begin with the Chicken disco dancing. The Barney character would join the Chicken on the field and dance too,

---

following: "If you're offended by material that suggests the killing of Barney, or like him in any way, please don't come here."

but in an ungainly manner that mimicked the real Barney's dance. The Chicken would then indicate that Barney should try to follow the Chicken's dance steps (albeit, by slapping the bewildered dinosaur across the face).  At this point, Barney would break character and out-dance the Chicken, to the crowd's surprise.  The Chicken would then resort to violence, tackling Barney and generally assaulting Barney.  Barney would ultimately submit to the Chicken and they would walk off the field  apparently friends, only for the Chicken to play one last gag on the back-in-character naive and trusting Barney.  The Chicken would flip Barney over a nearby obstacle, such as a railing.

Lyons ultimately filed a suit against Giannoulas and TFC, alleging trademark infringement, false association, unfair competition, and trademark dilution under the Lanham Act, copyright infringement, and other claims. The district court granted the defendants' motion for summary judgment.  In addition, the district court awarded attorneys' fees to the defendants based on provisions in the Copyright Act.  Lyons has filed a timely appeal with respect to the Lanham Act claims, the Copyright Act claims, and the award of attorneys' fees.

                                   II

Because this case comes to us on appeal from a summary judgment motion, we review the district court's decision <u>de novo</u> applying the same standards applied by the district court.  <u>See</u>

<u>Boyd v. State Farm Ins. Cos.</u>, 158 F.3d 326, 328 (5th Cir. 1998). The moving party is entitled to summary judgment if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A trademark is a word, name, symbol or device adopted and used by a manufacturer to identify the source of goods. To establish a trademark violation, Lyons must establish that Giannoulas has used in commerce a mark confusingly similar to Lyons's. 15 U.S.C. § 1127.[4] The district court held that there was no likelihood of consumer confusion. In reaching this decision, the district court relied on its finding that the Chicken's performance was clearly meant to be a parody.

Lyons makes two arguments with respect to its trademark confusion claim. First, Lyons argues that Giannoulas's use of Barney was not intended as a parody. Because Lyons continues to contest this issue on appeal, we first address whether there are

_____

[4]With respect to services, a mark is used in commerce "when it is used in the sale or advertising of services." <u>Id.</u> In this case, Lyons has a trademark in the image of Barney. Giannoulas contends that he has not used the image of Barney in the stream of commerce--i.e., that he only used the appearance of Barney to signal a parody of Barney, not to use Barney's image to promote the Chicken's service. Lyons contends that there is a factual issue regarding whether Giannoulas used images of the Barney character that appeared in mass media to promote his service. A review of the record reveals a genuine issue of material fact with respect to whether Giannoulas was promoting his show through media representations of the Barney caricature.

any genuine issues of material fact regarding whether Giannoulas was engaged in parodying Barney.  Lyons's second argument is that the district court accorded too much weight to its finding that Giannoulas's use was a parody.

A

In general, a parody is defined as an "artistic work that imitates the characteristic style of an author or a work for comic effect or ridicule." Campbell v. Acuff-Rose Music, 510 U.S. 569 (1994)(quotation omitted).  In general, a reference to a copyrighted work or trademark may be permissible if the use is purely for parodic purposes.  To the extent the original work must be referenced in order to accomplish the parody, that reference is acceptable.  Giannoulas claims that his use of a Barney look-alike clearly qualifies as a parody.  He used the minimum necessary to evoke Barney--while he used a character dressed like Barney that danced like Barney, he did not make any other references to the mythical world in which Barney resides.  He did not, for instance, incorporate any of Barney's other "friends" into his act, have the character imitate Barney's voice, or perform any of Barney's songs.  According to Giannoulas, Barney was clearly the butt of a joke and he referenced the Barney character only to the extent necessary to conjure up the character's image in his audience's mind.

Lyons argues that the conduct was not a parody but simply the use of Barney.  To support this claim, Lyons points to two kinds of

8

proffered evidence.  First, Lyons notes that Giannoulas himself admits that he did not have a definite plan when he incorporated Barney into the act.  Lyons argues that this creates an issue of fact regarding whether Giannoulas really intended to parody Barney or simply intended to profit from incorporating the Barney character into his act.

This argument is meritless.  Clearly, in the context in which Giannoulas intended to insert a reference to the Barney character, the humor came from the incongruous nature of such an appearance, not from an attempt to benefit from Barney's goodwill.  This point is clearly established by the fact that the Chicken's actions toward Barney seem to have always been antagonistic.  Although the performance may have evolved into a far more sophisticated form of commentary, even at its inception, it was clearly meant as a parody.

The second argument made by Lyons is that the audience could not have understood the performance to be a parody.  Lyons assumes that the target audience here is children and that children would clearly believe that the caricature actually <u>was</u> Barney.  Although Lyons is correct that the intended audience is an important factor in determining whether a performance qualifies as a parody, Lyons presented no credible evidence that a significant portion of the audience at evening sporting events are children.  Even if young children--like the two-year-old who had such a traumatic reaction

9

to the down-trodden Barney--are in attendance, we would expect them to be supervised by parents who could explain the nature of the parody.

We therefore agree with the district court that Giannoulas's use of the caricature clearly qualifies as a parody. We note that Lyons's insistence that the Chicken's act is not a parody is, in our view, a completely meritless argument.[5]

B

In order to understand Giannoulas's second argument, we must first review our own precedent with respect to consumer confusion under the Lanham Act. Our case law has set out a long list of non-exclusive, non-dispositive factors to consider when determining whether a use can result in confusion. These factors are referred to as the "digits of confusion." "In determining whether a likelihood of confusion exists, this court considers the following non-exhaustive list of factors: (1) the type of trademark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of

---

[5]It was, in fact, the plaintiff's tenacity in making this argument that led the district court to conclude that an award of attorneys' fees to Giannoulas was appropriate. Given the argument made by the plaintiffs, we agree completely with the district court on this point.

actual confusion." Elvis Presley Enters. v. Copeck, 141 F.3d 188, 194 (5th Cir. 1998); Conan Properties, Inc. v. Conan's Pizza, Inc., 752 F.2d 145, 149 (5th Cir. 1985); Armco, Inc. v. Armco Burglar Alarms Co., 693 F.2d 1155, 1159 (5th Cir. 1983). The Fifth Circuit has held that confusion resulting from a parody is not an affirmative defense to a trademark infringement claim but is instead an additional factor that should be considered. Elvis, 141 F.3d at 149.

The district court relied on its finding that the conduct was a parody when considering each of the remaining factors or digits described in Elvis. Giannoulas's argument is that, based on our reasoning in Elvis, the relevance of the conduct being a parody is only one "digit" to be considered among the "digits of confusion." Lyons argues the district court erred by relying on the conduct being a parody to conclude that the other factors did not indicate a risk of confusion. The crux of Lyons's argument is that, when considering whether conduct is likely to cause consumer confusion, even if there is overwhelming evidence that the conduct is a parody, the other digits of confusion must still be considered separately, without reference to whether the conduct is a parody. If, after conducting this analysis, there are factors that support the plaintiff's claim, he argues that the plaintiff should be permitted to proceed to trial.

11

Although such a hypertechnical reading of Elvis and its progeny may, on some abstract level, appear logical, we find this analysis absolutely absurd. Such an approach would all but require a trial for any trademark suit where the conduct was a parody. A brief consideration of only one of the digits of confusion makes this point clear.

The first digit, that is, the type of trademark allegedly infringed, questions whether the trademark is so distinctive that a consumer encountering the defendant's mark would be likely to assume that the source of a product or service is the owner of the trademark. Thus, under the traditional analysis, the stronger the trademark, the more likely that this factor would weigh in favor of the plaintiff. However, as the district court correctly noted in this case, when a consumer encounters the use of a trademark in a setting that is clearly a parody, the strength of the mark may actually make it easier for the consumer to realize that the use is a parody. Therefore, a strong mark is not as relevant a factor when the use is that of parody.[6]

---

[6]Lyons cites to Elvis to argue that a strong mark can be relevant even in the context of a parody. In Elvis, however, the issue was whether the Elvis trademark had been infringed by a nightclub titled "the Velvet Elvis." In that case the parody was not of Elvis but of cheesy sixties bars. Therefore, because Elvis was not the brunt of the joke, the fact that Elvis is a strong trademark could be regarded as an endorsement of the nightclub.

It seems reasonable to us to expect that most comedians will seek to satirize images or figures who will be widely recognized by their audiences. It therefore seems unlikely that comedians will target trademarks that do not have significant strength. If the district court were not able to consider the relevance that parody plays in this analysis, the district court would almost always have to conclude that this digit of confusion weighed in favor of the plaintiff. Such a result would effectively tie the district court's hands unnecessarily and prevent the district court from applying common sense to determine whether a particular factor is actually likely to lead to confusion.

Simply put, although the fact that conduct is a parody is not an affirmative defense to trademark infringement, a parody should be treated differently from other uses that infringe on a trademark. While it is only one factor to consider, it is a factor that must be considered in conjunction with all of the other digits of confusion. When, as here, a parody makes a specific, ubiquitous trademark the brunt of its joke, the use of the trademark for satirical purposes affects our analysis of the factors to consider when determining whether the use is likely to result in consumer confusion.

We therefore conclude that the district court did not err in considering the other digits of confusion in the light of its finding that the Chicken's performance is a parody. In doing so,

13

we hold that, when we stated in <u>Elvis</u> that use as parody was a relevant factor, we did not intend for the nature of the use to be considered separately from the other digits of confusion. The district court ably considered the other digits of confusion in this respect, and we find no error in its conclusion that there is insufficient evidence to support a violation under the Lanham Act.

III

In this case, Lyons argued that Giannoulas's use of a Barney caricature violated the Copyright Act and the Lanham Act. The district court disagreed and a review of the record indicates that the district court did not err in doing so. On appeal, we address only the argument related to the relevance that parodic conduct has on determining the likelihood of confusion in a trademark infringement case. We note that in this case the conduct was, without doubt, a parody. Having made that finding, the district court did not err in concluding that the nature of Giannoulas's use is relevant when analyzing the other digits of confusion to determine likelihood of confusion. For the foregoing reasons, the ruling of the district court is

A F F I R M E D.

14