# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 3, 2008

Charles R. Fulbruge III
Clerk

No. 07-20542

AMERICAN CENTURY PROPRIETARY HOLDINGS, INC.,
a Delaware corporation,

Plaintiff-Appellee,

v.

AMERICAN CENTURY CASUALTY COMPANY; a Texas corporation,
AMERICAN CENTURY CLAIMS SERVICE, INC., a Texas corporation,

Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:05-CV-02179

Before GARWOOD, CLEMENT, and ELROD, Circuit Judges.

PER CURIAM:[*]

Defendants-Appellants American Century Casualty Company ("ACCC") and American Century Claims Service, Inc. ("ACCS") (collectively "Auto") appeal the district court's grant of summary judgment to Plaintiff-Appellee American Century Proprietary Holdings, Inc. ("Financial"), which holds a trademark registration for the "AMERICAN CENTURY" mark. We affirm.

---

[*]Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

## I. BACKGROUND

Plaintiff-Appellee Financial is a Delaware corporation with its principal place of business in Kansas City, Missouri. Financial owns and licenses intellectual property utilized by its parent company and affiliates, which provide financial services. The Financial companies direct their services to both individual investors and institutions. The Financial companies do not sell insurance products, although they sell mutual fund services in part through independent financial advisors, who may also sell insurance products. Financial often uses a "Tree Logo" with its "AMERICAN CENTURY" mark and sometimes uses the word "Investments" with the mark. Financial advertises its services through a variety of channels, including magazines, radio, a website, and charitable efforts such as the "American Century Championship" celebrity golf tournament.

Defendants-Appellants ACCC and its subsidiary ACCS are Texas corporations with principal places of business in Houston, Texas. Both ACCC and ACCS target customers who may not qualify for standard insurance. ACCC is an insurance services corporation that provides non-standard automobile insurance policies in Alabama, Georgia, Louisiana, Mississippi, and Texas and expects to expand into other states. ACCC's automobile insurance is not advertised but is offered exclusively through independent insurance agents. ACCS provides automobile insurance underwriting and claims processing services in Texas only.

In May 2003, ACCC filed an application for the "AMERICAN CENTURY CASUALTY COMPANY & [Eagle] Design" mark for use in insurance underwriting and insurance claims processing services in the field of non-standard auto insurance, claiming a first use date of January 1, 1998, and a first use in commerce date of March 27, 2000. Separately, ACCS filed an application for the "AMERICAN CENTURY CLAIMS SERVICE, INC. & [Eagle] Design" mark for use in insurance claims administration in the field of non-standard

auto insurance, claiming a first use date of April 20, 2000. Prior to using their marks in connection with the offering of services, Auto did not conduct trademark searches or seek a legal opinion concerning the availability of the marks.

In response to Auto's registration applications, Financial filed suit against Auto alleging five causes of action: trademark infringement, false designation of origin, and trademark dilution in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) & (c); violation of the Texas Anti-Dilution Statute, Tex. Bus. & Com. Code § 16.29; and unfair competition under Texas common law.

After discovery, Financial moved for summary judgment.[2] The magistrate judge found that Financial had not established either likelihood of confusion or likelihood of dilution as a matter of law and recommended that the motion be denied. Auto did not file objections to the magistrate's recommendation, which favored its position. Financial objected to the magistrate's overall conclusions that there was no likelihood of confusion and that genuine issues of fact prevented summary judgment on the likelihood-of-dilution issue. Financial also specifically objected to the magistrate's findings on certain individual digits of confusion.

The district court disagreed with the magistrate's recommendation and granted Financial's motion, holding that Financial had established both a likelihood of confusion and a likelihood of dilution as a matter of law. The district court subsequently granted an injunction (stayed pending this appeal) prohibiting Auto from using the "AMERICAN CENTURY" mark.

## II. DISCUSSION

### A. Standard of Review

We generally review a grant of summary judgment de novo. See ICEE

---

[2] Financial sought summary judgment on all but the federal dilution claim, which became moot when the court granted summary judgment on its other claims. The federal dilution claim was dismissed by the district court without prejudice and with leave to reinstate should its injunction later be vacated.

Distribs., Inc. v. J&J Snack Foods Corp., 445 F.3d 841, 844 (5th Cir. 2006). Financial, however, argues that in this case, each digit of confusion finding should be evaluated individually to determine the appropriate standard of review. Financial argues that a digit of confusion finding made by the magistrate judge to which neither party objected and which was accepted by the district court should be reviewed for "plain error" rather than de novo. See Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc) (holding that the failure to file written objections to a magistrate judge's report and recommendation "shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court").

In response to Financial's argument for a factor-by-factor differing standard of review Auto cites Guillory v. PPG Industries, Inc., 434 F.3d 303 (5th Cir. 2005). In that case, we stated that when the district court engages in an "independent evaluation of the record . . . the standard of review depends upon the issue on appeal." Id. at 308 (citation omitted). In Guillory, the district court stated that it had conducted an independent review of the record and fully agreed with the magistrate judge. Id. at 307, 308 n.5 (noting that the district court stated in the alternative that it had conducted an independent review, but finding that "[a]lthough this may be judicial boilerplate, we take it as indication that the district court conducted its own review of the record, sufficient to avoid Douglass's plain-error review standard for unobjected-to magistrate reports"). For that reason, despite a complete lack of objections to the magistrate's findings of fact and conclusions of law, our court in Guillory conducted a de novo review of the district court's denial of the motion to remand. Id. at 308. In this case, the issue on appeal is whether there is a likelihood of confusion. Auto argues that although the district court may not have conducted an independent evaluation of each of the "digits of confusion" findings in the magistrate judge's analysis, it did conduct an independent evaluation of the larger issue, likelihood

4

of confusion, and de novo review is thus appropriate.

We need not decide whether Guillory or Douglass is most applicable here, for the same result obtains in this case regardless of which standard applies. We therefore assume, without deciding, that Guillory controls this case, and apply the more rigorous de novo standard.

## B.    Inferences from Summary Judgment Evidence

Auto argues that the district court impermissibly weighed evidence in making its summary judgment determination rather than waiting to assess the entire body of evidence that would be presented at a bench trial (as neither party requested a jury). Auto, however, has not identified a material factual dispute or described any particular inference that the district court drew from the summary judgment evidence. The basic facts upon which the likelihood-of-confusion analysis depended were not in dispute, and there were no relevant issues of witness credibility.

"If [a] decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though [the] decision may depend on inferences to be drawn from what has been incontrovertibly proved." Nunez v. Superior Oil Co., 572 F.2d 1119, 1123–24 (5th Cir. 1978). "Thus, where . . . the evidentiary facts are not disputed, a court in a non-jury case may grant summary judgment if trial would not enhance its ability to draw inferences and conclusions." Id. at 1124. When the judge, as trier of fact, is in such a position, he "ought to draw his inferences without resort to the expense of trial." Id.; accord Prof'l Geophysics, Inc. v. Placid Oil Co. (In re Placid Oil Co.), 932 F.2d 394, 398 (5th Cir. 1991) ("We follow the Nunez court in recognizing that it makes little sense to forbid the judge from drawing inferences from the evidence submitted on summary judgment when that same judge will act as the trier of fact, unless those inferences involve issues of witness credibility or disputed material facts."); see

also King v. Ames, 179 F.3d 370, 374 (5th Cir. 1999).

In the present case, the underlying material facts were undisputed, witness credibility was not an issue, and the court was the sole factfinder. Therefore, to the extent that the district court may have done so, it was authorized to draw inferences from undisputed evidence, conclude that there were no genuine issues of material fact, and determine that Financial should prevail—without having to sit through a bench trial that would present largely the same evidence.

C.     Likelihood of Confusion

Auto argues that the district court erred in granting summary judgment on the likelihood-of-confusion claims. Likelihood of confusion is the central evidentiary test for three of the four causes of action on which Financial sought summary judgment: infringement under the Lanham Act, false designation of origin under the Lanham Act, and unfair competition under Texas common law. See Westchester Media v. PRL USA Holdings, Inc., 214 F.3d 658, 663 n.1 (5th Cir. 2000) (Lanham Act and Texas unfair competition); Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 258-59 (5th Cir. 1980) (Lanham Act infringement and false designation of origin). Under the likelihood-of-confusion test, the plaintiff must prove that the defendant's use of its mark "creates a likelihood of confusion in the minds of potential consumers as to the 'source, affiliation, or sponsorship'" of the defendant's services. Westchester Media, 214 F.3d at 663 (citations omitted). "Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion." Id. at 663–64 (citation omitted).

We consider "a long list of non-exclusive, non-dispositive factors . . . when determining whether a use can result in confusion." Lyons, 179 F.3d at 388. These factors, known as the "digits of confusion," include the following:

> (1) the type of trademark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or

6

services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion.

Elvis Presley Enters. v. Capece, 141 F.3d 188, 194 (5th Cir. 1998); accord Scott Fetzer Co. v. House of Vacuums Inc., 381 F.3d 477, 484–85 (5th Cir. 2004).

The digits of confusion "do not apply mechanically to every case and can serve only as guides, not as an exact calculus." Scott Fetzer Co., 381 F.3d at 485 (citation omitted). We "'consider the marks in the context that a customer perceives them in the marketplace, which includes their presentation in advertisements.'" Id. (quoting Elvis Presley Enters., 141 F.3d at 197). In short, we "consider the application of each digit in light of the specific circumstances of the case," id., and "different factors will weigh more heavily from case to case depending on the particular facts and circumstances involved," Marathon Mfg. Co. v. Enerlite Prods. Corp., 767 F.2d 214, 218 (5th Cir. 1985).

As a general rule, if the likelihood-of-confusion analysis "is closely balanced, the question should be resolved in favor of the senior user." Quantum Fitness Corp. v. Quantum LifeStyle Ctrs., L.L.C., 83 F. Supp. 2d 810, 831 (S.D. Tex. 1999); 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:64 (4th ed. 2006) ("The burden of proof is always on the plaintiff, but when the evidence is weighed and the scales balance equally, the doubt is resolved in favor of the party who has built up valuable rights in the mark.").

The district court considered the various factors and concluded that there was "clearly a likelihood of confusion" between the two marks. In reviewing that conclusion, we consider the digits of confusion in order below.

1.    Type and Strength of Mark

It is undisputed that the mark is arbitrary and strong. This factor weighs in Financial's favor.

2.    Similarity Between Marks

7

The degree of similarity between marks "is determined by comparing the marks' appearance, sound, and meaning." Elvis Presley Enters., 141 F.3d at 201. Furthermore, "[e]ven if prospective purchasers recognize that the two designations are distinct, confusion may result if purchasers are likely to assume that the similarities in the designations indicate a connection between the two users. The relevant inquiry is whether, under the circumstances of the use, the marks are sufficiently similar that prospective purchasers are likely to believe that the two users are somehow associated." Id. (citation and internal quotation marks omitted).

As a general rule, the similarity in the design and appearance of marks "is determined by considering the overall impression created by the mark as a whole rather than simply comparing individual features of the marks." Exxon Corp. v. Tex. Motor Exch. of Houston, Inc., 628 F.2d 500, 505 (5th Cir. 1980). Financial contends the "similarity of marks" weighs in its favor because the words "AMERICAN CENTURY" are the distinctive feature of each of the parties' marks. Financial further argues that because the words "Casualty Company" and "Claims Service" are generic, people will logically refer to both ACCC and ACCS simply as "American Century." In fact, there is evidence that the full forms of Auto's marks do not appear on the rate reports the insurance agents share with potential customers but are reduced to abbreviations, such as "Amer. Century Cas.," and do not contain the Eagle Logo. The evidence also demonstrates that third parties such as police officers sometimes abbreviate Auto's name to "American Century."

Financial uses the "AMERICAN CENTURY" mark either alone or followed by the words "Proprietary Holdings, Inc." or "Investments." There is no evidence that Financial has ever used the words "casualty," "insurance," or "claims" in conjunction with its mark. Nor is there evidence that Auto uses the word "investments" or any other language that suggests that Auto provides financial services in addition to insurance.

Immediately adjacent to the company name, Auto often includes its logo, an eagle with the word "American" appearing above the eagle and "Century Casualty Company" or "Century Claims Service, Inc." appearing below it. Similarly, Financial often includes its logo, a tree (one of two similar varieties) appearing immediately above the words "American Century" or "American Century Investments." The district court found that "based on the appearance, sound, and meaning of the parties' marks, the marks are clearly similar," and prospective purchasers are likely to believe that the two users are somehow associated. We agree with this assessment.

3.     Similarity of the Products or Services

Although as a general rule, "[t]he greater the similarity between the products and services, the greater the likelihood of confusion," Tex. Motor Exch., 628 F.2d at 505, actual similarity is not required. Confusion can arise from a perceived affiliation between the two parties under the circumstances:

> Direct competition between the parties' services or products is not required in order to find a likelihood of confusion. . . . When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection.
>
> The danger of affiliation or sponsorship confusion increases when the junior user's services are in a market that is one into which the senior user would naturally expand. The actual intent of the senior user to expand is not particularly probative of whether the junior user's market is one into which the senior user would naturally expand. Consumer perception is the controlling factor. If consumers believe, even though falsely, that the natural tendency of producers of the type of goods marketed by the prior user is to expand into the market for the type of goods marketed by the subsequent user, confusion may be likely.

Elvis Presley Enters., 141 F.3d at 202 (internal citations and quotation marks omitted).

In this case, Auto offers only non-standard automobile insurance; it does not offer mutual funds or investment services. Financial offers only mutual

funds and related financial services; it does not offer insurance. Neither party has plans to offer the services currently provided by the other. Consumers, however, are familiar with numerous third-party companies that offer both financial and insurance services under the same mark. Financial thus argues that consumers encountering Auto's "AMERICAN CENTURY" mark might naturally assume that Financial has expanded into the field of insurance. The district court found that "consumers are likely to view the parties' businesses as logically affiliated or connected." We agree with this assessment.

### 4. Identity of Retail Outlets and Purchasers

"Dissimilarities between the retail outlets for and the predominant consumers of [a plaintiff's and a defendant's respective] goods lessen the possibility of confusion, mistake, or deception." Amstar Corp., 615 F.2d at 262. Financial sells mutual funds through three main channels of trade: direct channels (including individual investors), institutional channels (including public employee retirement plans), and third-party intermediary channels (including brokerage firms). Auto sells its products exclusively through independent insurance agents. There is no evidence in the record that the independent agents who sell Auto's insurance also sell investment services, although some of Financial's "AMERICAN CENTURY" mutual funds are sold through independent financial advisers who also offer their clients insurance products. Auto argues that it sells mostly to low-income customers while Financial targets wealthier investors, although Auto cites no specific evidence in support. We find that the evidence of potential confusion related to the "identity of retail outlets and purchasers" factor is weak and does not support a likelihood of confusion.

### 5. Identity of Advertising Media

Generally, "the greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion." Quantum Fitness Corp., 83 F. Supp. 2d at 827 (internal quotation marks omitted). Here, there is

no evidence that Auto advertises in any media, although Financial advertises nationwide.  Auto has never had a website directed to the public, although it plans to launch one; Financial operates a website at "www.americancentury.com."  Auto sells its products through independent insurance agents only in the states of Alabama, Georgia, Louisiana, Mississippi and Texas, and it does not advertise (although ACCC's name is listed in the White Pages).  Financial, in contrast, advertises to people and businesses throughout the United States through a variety of marketing channels; from 1997 through 2005, Financial spent over $470 million marketing and promoting its services.  Financial argues that there is overlap because its nationwide advertising reaches the states in which Auto operates.  See Elvis Presley Enters., 141 F.3d at 200 n.6 (noting that where the plaintiff "advertises nationwide and its licensees distribute products nationwide . . . the parties' geographic markets do overlap" even though the defendant operates only in a single state).  Because Auto does not advertise, we find that this factor does not support a likelihood of confusion.

6.    Intent of Defendants

There is no evidence that Auto "adopted a mark with the intent of deriving benefit from the reputation of the plaintiff."  Tex. Motor Exch., 628 F.2d at 506. Therefore, we find that this factor does not support a likelihood of confusion.

7.    Evidence of Actual Confusion

While not necessary for a finding of likelihood of confusion, evidence of actual confusion "'is nevertheless the best evidence of a likelihood of confusion.'" Elvis Presley Enters., 141 F.3d at 203 (quoting Amstar Corp., 615 F.2d at 263). "To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion or consumer surveys."  Scott Fetzer Co., 381 F.3d at 486 (citations omitted).  "An absence of, or minimal, actual confusion, however, over an extended period of time of concurrent sales weighs against a likelihood of confusion."  Elvis Presley Enters., 141 F.3d at 204.  Of course, no single digit of

confusion is determinative.

Financial proffered some evidence to show the existence of actual confusion. Two of Financial's employees, while not recalling specific instances, testified that they receive enough misdirected telephone calls that they keep Auto's telephone number on hand to redirect callers. The evidence also showed at least two instances of misdirected phone calls due to police officers' use of "American Century" as an abbreviation for Auto on police reports, and one misdirected phone call after a Yahoo search for "American Century Insurance." Financial's address has been used mistakenly on various correspondence directed to Auto, including a subpoena addressed to American Century Claims. In all, the magistrate judge noted that Financial has proven six specific incidents of actual confusion, although the parties have both been in business for a number of years.[3]

Auto argues that six incidents over six to ten years are de minimis, such that the actual confusion factor weighs heavily against a likelihood of confusion. Auto further argues that the minimal incidents of actual confusion "refute[]" or "raise[] a presumption against" the likelihood of confusion, precluding summary judgment. Soc'y of Fin. Exam'rs v. Nat'l Ass'n of Certified Fraud Exam'rs, Inc., 41 F.3d 223, 228 (5th Cir. 1995) (finding that "twelve examples [of actual confusion] over a five year period[] refutes the likelihood of confusion"); Amstar Corp., 615 F.2d at 263 (holding that "the fact that only three instances of actual confusion were found after nearly 15 years of extensive concurrent sales under the parties' respective marks raises a presumption against likelihood of confusion in the future").

Given the parties and their respective lines of business, we would not necessarily expect more instances of "actual confusion" to have come to light, and

---

[3] Despite initially taking the position that its mark was first used in commerce in 2000, Auto later claimed that it had first used its mark in December 1996. Financial objected to the late production of Auto's documents in support of the 1996 date. We do not address the dispute, as it is immaterial to this analysis whether the first-use date was 1996 or 2000.

we decline to apply a presumption against a likelihood of confusion under these circumstances. This factor is not highly probative of a likelihood of confusion under the facts of this case, but, in our opinion, weighs slightly in favor of Financial.

8.     Overall Finding of a Likelihood of Confusion

Auto argues that it has shown differences in the marks as presented in the marketplace, differences in advertising, differences in the services offered, and differences in the channels of trade. Auto argues that the totality of the circumstances shows there is no likelihood of confusion and that the record does not support the district court's contrary finding. Our de novo review of the record, however, leads us to agree with the district court's conclusion that (i) Auto did not raise a genuine issue of material fact for trial; and (ii) Financial demonstrated a likelihood of confusion between the marks. We bear in mind the rule that if the likelihood-of-confusion analysis "is closely balanced, the question should be resolved in favor of the senior user." Quantum Fitness Corp., 83 F. Supp. 2d at 830–31. As the trial court correctly concluded, the evidence of likelihood of confusion in this case is closely balanced, and thus favors Financial. Summary judgment was properly granted to Financial on the likelihood-of-confusion claims.

D.    Texas Anti-Dilution Statute

The district court also granted summary judgment to Financial on its claim that Auto's use of the "AMERICAN CENTURY" mark diluted Financial's trademark in violation of the Texas Anti-Dilution Statute. The relevant portion of the statute states:

> A person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under this chapter or Title 15, U.S.C., or a mark or trade name valid at common law, regardless of whether there is competition between the parties or confusion as to the source of goods or services.

Tex. Bus. & Com. Code § 16.29. To succeed under the statute, the plaintiff "must show that it owns a distinctive mark and that there is a likelihood of dilution." E. & J. Gallo Winery v. Spider Webs Ltd., 286 F.3d 270, 278 (5th Cir. 2002); accord Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp., 53 S.W.3d 799, 811 (Tex. App.—Austin 2001, pet. denied).

1.     Distinctiveness of Financial's Mark

To prevail on dilution, Financial must first show that its mark is "distinctive." As we have noted:

> The Texas anti-dilution statute explicitly requires only distinctiveness, not fame. Courts applying the statute have not required fame for a party to prevail on a dilution claim. Under Texas law, to determine whether a mark is distinctive enough for dilution, the court considers factors much like those used in the FTDA fame analysis: whether the mark is arbitrary, the length of time the user has employed the mark, the scope of the user's advertising and promotions, the nature and extent of the first user's business, and the scope of the first user's reputation. . . . [A] somewhat stricter standard is to be applied in determining "strength" in dilution analysis than in likelihood of confusion analysis.

Advantage Rent-A-Car, Inc. v. Enter. Rent-A-Car Co., 238 F.3d 378, 381 (5th Cir. 2001) (internal citations and quotation marks omitted). In this case, the evidence on these factors is as follows: (1) the parties agree that the mark is arbitrary (connoting strength); (2) Financial has used its mark for over ten years; (3) Financial advertises heavily nationwide through various media and has spent over $470 million marketing and promoting its services; (4) Financial sells a variety of financial services and has approximately $100 billion in assets under management, generates on average $728 million in revenue annually from sales of mutual funds sold under the "AMERICAN CENTURY" mark, and has over two million customers worldwide; and (5) as a result, Financial has a strong reputation.

Auto claims that the Texas Anti-Dilution Statute, like the federal statute,

requires the plaintiff's mark to have acquired sufficient distinctiveness before the accused defendant began use of its mark. The law is unclear on this point, and Financial correctly points out that the Texas statute was not modeled after the federal statute. See Exxon Corp. v. Oxxford Clothes, Inc., 109 F.3d 1070, 1081 (5th Cir. 1997). The evidence in the record is inconclusive regarding when Auto first used its mark in commerce specifically in Texas. Auto claims that it first used the mark in commerce generally in 2000, and the evidence shows that Auto began selling insurance policies in Texas in 2004. Under either date, however, Financial had already been using and advertising its mark nationwide for years; it was using the mark in commerce by at least January 1997 and advertising extensively.[4] Accordingly, the district court correctly held that the undisputed facts show that Financial's mark is distinctive.

2. Likelihood of Dilution

The Texas Anti-Dilution Statute also requires that there be a likelihood of dilution. "Dilution involves the gradual 'whittling away' of a party's distinctive mark through unauthorized use by another." Horseshoe Bay, 53 S.W.3d at 812 (citation omitted). "Even in the absence of consumer confusion, an unauthorized user's adoption of another's mark lessens that mark's capacity

---

[4] Auto claims priority of use based on a letter dated January 19, 1996, sent from a vice president of General Reinsurance Corp. to one of Auto's principals. Elsewhere, however, Auto admitted that it did not use the "AMERICAN CENTURY" mark in commerce until 2000. Use in commerce is the key date for determining priority under trademark law. See Keane v. Fox Television Stations, Inc., 297 F. Supp. 2d 921, 936 (S.D. Tex. 2004) ("Winning the race to the marketplace is not accomplished by being the first in time to use a mark, but requires both appropriation of the mark and use of the mark in trade.") (citations omitted). Thus, the 1996 letter is insufficient by itself to establish a prior claim to the "AMERICAN CENTURY" mark because it was not generated by Auto and was not the "active use [that] allows consumers to associate a mark with particular goods and notifies other firms that the mark is so associated." Zazu Designs v. L'Oreal, S.A., 979 F.2d 479, 503 (7th Cir. 1992). Additionally, Financial filed an intent-to-use application for the mark on September 5, 1995, see Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc., 186 F.3d 311, 315 (3d Cir. 1999) (noting that under 15 U.S.C. § 1057(c) filing an application to register a mark constitutes constructive use and confers a right of priority), and first used it commercially in December of 1996 in a financial newsletter and in January of 1997 for other services. Thus, we find Auto's claim of priority unconvincing.

to identify the true owner's goods and services." Id. In this case, dilution due to "blurring" (not "tarnishing") is alleged. "'Blurring' is a diminution in the uniqueness and individuality of a mark or trade name." Express One Int'l, Inc. v. Steinbeck, 53 S.W.3d 895, 899 (Tex. App.—Dallas 2001, no pet.).

Financial makes two arguments in support of its blurring claim. First, Financial points to evidence that the parties are unaware of any third-party users of "AMERICAN CENTURY" in connection with insurance or financial services, so the mark is not being blurred by other parties. Second, Financial claims that because the distinguishing portions of Auto's marks are identical to the distinguishing portions of Financial's mark, Auto's use of the "AMERICAN CENTURY" mark will diminish the uniqueness and individuality of Financial's mark. See BankAmerica Corp. v. Nation's Bankers Mortgage, Inc., 92 F. Supp. 2d 607, 612 (S.D. Tex. 1999) (granting summary judgment under a blurring theory that the defendant's continued use of "NATION'S BANKERS" for mortgage brokerage services would dilute the distinctive quality of the plaintiff's "NATIONSBANK" mark for banking and financial services).

We find that the district court correctly held that (i) there were no genuine issues of material fact regarding whether a likelihood of dilution exists; and (ii) Auto's use of marks containing "AMERICAN CENTURY" was likely to dilute Financial's mark.

3.    Evidence Specific to Texas

Finally, Auto argues that Financial's evidence concerning distinctiveness and dilution was insufficient to support a summary judgment in Financial's favor on its state law dilution claim because the evidence did not pertain specifically to Texas. As Auto failed to make this argument before the district court, we do not consider it. See Vaughner v. Pulito, 804 F.2d 873, 877 n.2 (5th Cir. 1986) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.").

16

III. CONCLUSION

We AFFIRM the district court's summary judgment.


GARWOOD, Circuit Judge, concurring in part and dissenting in part.


I concur in so much of the majority opinion as relates to the Texas Anti-Dilution Statute.

However, in my view likelihood of confusion, which Financial has the burden of showing, is not adequately established.

I agree with the majority opinion's careful analysis of most of the digits of confusion and with its conclusion that several do not support likelihood of confusion, namely identity of retail outlets and purchasers (which are clearly and markedly distinct), identity of advertising media (Auto does not advertise), and intent of defendants (there is no evidence Auto adopted its mark with the intent of deriving benefit from the reputation of Financial). I also agree that Financial's mark is arbitrary and strong, that the marks are similar, and that the evidence of actual confusion "is weak" and "not highly probative of likelihood of confusion."

That leaves similarity of products or services, which in my view is crucial in this setting. I disagree with the conclusion that "consumers are likely to view the parties' businesses as logically affiliated or connected." As the majority notes, "Auto offers only non-standard automobile insurance; it does not offer mutual or investment services. Financial offers only mutual funds and related financial services; it does not offer insurance. Neither party has plans to offer the services currently provided by the other." It may well be true in the case of life insurance or annuities that "[c]onsumers . . . are familiar with numerous third-party companies that offer both financial and insurance services under the same mark." But that is simply not true in respect to insurance companies, such as Auto, offering only non-standard automobile insurance. Financial's customers are investors; Auto's customers are those who want automobile liability

insurance but can only afford the "non-standard" variety.  Auto's customers are not going to be buying Financial's investments. Financial customers – actual and potential – are not going to be buying non-standard automobile insurance.  That in the rare and unlikely event a Financial customer might conceivably think – if he thought about it at all – that there was an affiliation between Financial and Auto when he makes a claim on another driver's non-standard Auto policy is simply not enough to carry the day.

Likelihood of dilution is adequately shown as the majority well explains. But, in real life, any meaningful actual confusion seems unlikely.

I therefore dissent from the majority's holding on likelihood of confusion.